1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   UNITED STATES OF AMERICA,     )
                                   )
 4          Plaintiff,             )    04 CR 372
                                   )
 5      vs.                        )    Chicago, Illinois
                                   )    November 19, 2008
 6   MICHAEL T. DOWD,              )    10:00 o'clock a.m.
                                   )
 7          Defendant.             )

 8                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
 9

10   APPEARANCES:

11   For the Plaintiff:           OFFICE OF THE U.S. ATTORNEY
                                  219 South Dearborn Street
12                                5th Floor
                                  Chicago, Illinois  60604
13                                BY:  MR. BARRY R. ELDEN
                                       MR. STEPHEN L. HEINZE
14
     For Defendant Dowd:          MR. RALPH E. MECZYK
15                                111 West Washington Street
                                  Suite 1625
16                                Chicago, Illinois  60602

17   Probation Officer:           MS. JENNIFER PROVADA,
                                  United States Probation Officer
18
                     MAELLEN E. PITTMAN, RDR, FCRR
19                     219 South Dearborn Street
                              Room 2342
20                     Chicago, Illinois  60604
                            (312) 435-5576
21                        mae.pittman@yahoo.com

22

23

24

25
```

1          (Proceedings in open court:)

2               THE CLERK:  04 CR 372, United States versus Michael

3     Dowd.

4               Sentencing.

5               MR. ELDEN:  Good morning, your Honor.

6               Barry Elden and Steve Heinze on behalf of the United

7     States.

8               MR. MECZYK:  May it please the Honorable Court, your

9     Honor, Ralph Meczyk on behalf of Michael Dowd.

10              THE COURT:  Good morning.

11              MR. MECZYK:  Good morning.

12              THE PROBATION OFFICER:  Good morning, your Honor.

13              Jennifer Provada on behalf of U.S. Probation.

14              THE COURT:  Good morning.

15              Ms. Provada, you may be seated if you wish.

16              Are you Michael T. Dowd?

17              THE DEFENDANT:  Yes.

18              THE COURT:  Please raise your right hand and be

19    sworn.

20         (Defendant sworn.)

21              THE COURT:  Mr. Meczyk, you have submitted a very

22    substantial sentencing memorandum, as well as numerous letters

23    from supporters of Mr. Dowd.

24              With respect to the presentence investigation report,

25    is there anything in the report that you find is inaccurate or

1   that you wish to challenge in any respect?

2         MR. MECZYK:  Your Honor, before I answer your

3   question, I want you to know at the outset that Mr. Dowd stands

4   very humbly before you today, as I do too.

5         I will answer your question, sir.  Yes, there are

6   objections that we have that we have raised in our submission,

7   our position paper to the Court, and I would like to be heard

8   on my submissions.

9         THE COURT:  Yes, indeed.

10        On behalf of the government, Mr. Elden, Mr. Heinze,

11  with respect to the presentence investigation report, is there

12  anything in that report that you find is inaccurate or that you

13  wish to challenge in any respect?

14        MR. ELDEN:  Your Honor, there are a couple of minor

15  matters that I can read off.  On line 25 it indicated that the

16  defendant filed a joint tax return.  It actually was an

17  individual tax return.

18        Lines 85 through 91 --

19        THE COURT:  That report will be corrected to reflect

20  that.

21        MR. ELDEN:  Lines 85 through 91 deal with the tax

22  loss calculation and it indicated that some of the deductions

23  were reduced by the revenue agents when they made the

24  calculations.  That's not correct.  The agents gave the

25  taxpayers the benefit of all of the deductions that they

4

1  claimed and assumed for purposes of calculation that those were

2  deductions that should reduce the income.

3        THE COURT:  All right.  As I recall the testimony of

4  the agent in support of the written submission by the

5  government, that is an accurate observation.

6        But with respect to line 884, the amount at trial

7  established by the evidence, the loss to the treasury was

8  $60,156,124, and that was not as to the 650 clients, but only

9  as to the 420 clients.  So that the government's argument along

10 the way has been that the $60 million loss to the treasury is a

11 conservative figure.

12       MR. ELDEN:  That is correct, your Honor.

13       There is mention of the 230 clients in line 91.  I

14 wanted to clarify that those 230 clients were -- there was no

15 tax loss attributed to them.  For most of those, about 200,

16 there wasn't enough information to make a calculation.  For

17 about 20 or 30 of those, there was no tax loss.  So for the

18 bulk of those 230, there just was not enough information to

19 make a calculation.

20       THE COURT:  All right.  We will return to this issue

21 of loss which Mr. Meczyk will address along the way.

22       There is another calculation of loss that would

23 suggest a tax loss to the treasury not of 60 million, but of 50

24 million approximately, and we will return to that issue.

25       MR. ELDEN:  Yes.

5

1            And, your Honor, I just wanted to make one other

2   mention here.  On line 183 it indicates that the defendant owes

3   the government $142,000.  Actually the correct figure is

4   55,171.  The 142 is the amount of money that Mr. Dowd received

5   from the scheme, from the companies that were a part of the

6   scheme, the Aegis company and Heritage.  But the actual tax due

7   and owing would be 55,171, and that point comes up again in

8   line 368.

9            MR. MECZYK:  Certainly objection to that, your Honor.

10           THE COURT:  All right.  The correction will be made,

11  the tax due and owing as 55,171.

12           MR. ELDEN:  Yes, your Honor.

13           THE COURT:  So the probation officer will take the

14  steps to make those modifications.

15           THE PROBATION OFFICER:  I'm sorry.  What was the

16  amount?

17           THE COURT:  55,171.

18           THE PROBATION OFFICER:  In line 300 and what?

19           MR. ELDEN:  368, it comes up again.

20           THE PROBATION OFFICER:  Thank you.

21           THE COURT:  183 and 368.

22           THE PROBATION OFFICER:  Okay.

23           THE COURT:  So with respect to the sentence itself,

24  Mr. Meczyk, do you wish to proceed?

25           MR. MECZYK:  I do, your Honor.  Thank you.

1              THE COURT:  Are you ready to go now or do you need

2    some time?

3              MR. MECZYK:  I'm prepared to proceed, your Honor.

4              THE COURT:  You may proceed.

5              MR. MECZYK:  Thank you.

6              May it please the Court, your Honor, Mr. Dowd is

7    going to respectfully urge that you depart from the applicable

8    guidelines which we'll discuss shortly.

9              THE COURT:  Mr. Dowd, you may be seated if you wish.

10   It's up to you.

11             MR. MECZYK:  Thank you, your Honor.

12             THE DEFENDANT:  Thank you.

13             MR. MECZYK:  And moreover, your Honor, we would also

14   seek a variance from the guidelines for the reasons stated in

15   the submissions and the reasons I'm going to briefly state to

16   the Court now.

17             Your Honor, I'm going to respectfully ask that you

18   also take into consideration the most recent pronouncements by

19   the United States Supreme Court and its progeny in the Seventh

20   Circuit decisions concerning Section 3553(a), which of course

21   now adds a gloss or superimposes over the now advisory

22   guidelines the standard that you respectfully shall impose a

23   sentence that is sufficient but not greater than necessary to

24   comply with the basic aims of sentencing in 3553.

25             Your Honor, with that then I will respectfully urge

1  the Court that the government -- I would urge the Court to

2  consider the loss amount, which I will hotly dispute.  The loss

3  amount is at the -- I'm sorry, the government miscalculates the

4  total loss amount because it is -- the real issue now is the

5  ambit of the conspiracy, and when Mike -- when the conspiracy

6  actually began among the co-conspirators and when it ended.

7            We are talking about the Aegis scheme.  The Aegis

8  scheme began roughly about 1997.  I know that your Honor is

9  aware of the testimony that was adduced at trial that Mike

10 began working for Aegis right after his graduation from

11 Northern Illinois University in late 1999.  Then his

12 involvement ended in roughly about April of 2001.  That is

13 about the time when Cover and Vallone and the others were

14 sending out those bogus letters, if you will, notifying their

15 customers and their clients that they really didn't have to pay

16 taxes.  That was their -- another avoidance scheme.  That's

17 when Mike, as you recall, had enough.  I insert that now and I

18 digress now because that sort of dovetails into one of the

19 arguments that I'm going to make later concerning the imperfect

20 withdrawal from the scheme.

21           But getting back to the tax loss amount, the

22 government's calculation, your Honor, for the scope or the

23 ambit of the scheme begins with a base offense level of 30

24 because it is an amount that they claim -- the government

25 claims the loss amount attributed to the scheme is $50,085,851,

8

1    and, of course, that tax loss falls between 50 million and 100
2    million, that's where it's graduated under the sliding scale of
3    the advisory guidelines, which as I said puts him at a level
4    30.  And that represents, according to the government, the tax
5    loss caused by this conspiracy from 1997 to 2001.  That is a
6    full two years, your Honor, before Mike became involved as an
7    employee of Aegis.
8         Your Honor, the commentary for the loss guidelines --
9    and not to read too much from our submissions, I know you have
10   vetted that very, very carefully -- but again, it's worth
11   mentioning and worth noting that the commentary to
12   1B1.3(a)(1)(B), the commentary notes that the defendant's
13   relevant conduct does not include the conduct of the members of
14   the conspiracy before the defendant joins the conspiracy.
15        So with respect to a conspiracy to defraud, a
16   defendant is not accountable for the conduct of members of the
17   conspiracy.  These are the operative words or the crux of the
18   decisions interpreting that commentary and guideline.  The
19   defendant is not accountable for the conduct of the members of
20   the conspiracy prior to the defendant joining the conspiracy,
21   even if the defendant knows of the conduct.
22        Again, your Honor, Mike was involved in the Aegis
23   scheme, began in late 1999 and ended in April of 2001, which
24   would be actually a very short ambit, about 18 months.
25        Therefore, your Honor, we respectfully would submit

1    to the Court that based on the government's calculations for
2    the three-year period that Michael was working there, that the
3    loss amount would be $24 million and not the more egregious
4    amount of $50 million as the loss alleged by the government in
5    this case.  Therefore, under the guidelines in effect now, his
6    offense level would be reduced to a level 28 as opposed to a
7    level 30.
8              Moreover, your Honor, this is the next issue that I
9    suppose will be hotly debated by both myself and the
10   government, is that we would respectfully ask the Court to
11   consider -- I'm sorry.  Let me back up.
12             Under the current guidelines, advisory guideline
13   sentencing scheme, the level is reduced to a 28 because 24
14   million brings it down to a loss of less than 50 million.
15             Moreover, your Honor, if you were to consider -- and
16   again, this is the issue that will be debated I imagine, if you
17   were to consider the 2000 guidelines which were in effect at
18   the time, the level would be further reduced, rather
19   drastically reduced to a level 24.  And the appropriate version
20   of the guideline manual is the one in effect at the time of
21   sentencing.  That is what the Courts have said, your Honor.
22   However, I know that you are -- more than have a passing
23   acquaintance with the Demery opinion, the Seventh Circuit Court
24   decision in Demery, stating that the Court -- because the
25   guidelines are in effect advisory and not truly binding, the

1    Court is unfettered and free, it has absolute discretion to

2    apply the current set of guidelines as they are in effect at

3    the day of sentencing.

4              However, there is no restriction, there is no caveat

5    whatsoever telling the district court judge, telling your Honor

6    or instructing your Honor that that has to be applied.  That

7    you are free to apply the, if I may say, the more lenient

8    version, which is the 2000 version in Mike's case, which is the

9    guidelines at the time, not advisory, the guidelines that were

10   in effect at the time the offense was committed.  And I would

11   respectfully urge the Court to adopt that more lenient

12   guideline range.

13             Therefore, your Honor, the 2001 version -- I'm sorry,

14   in April of 2001 when Mike's participation ended, the 2000

15   sentencing guidelines were in effect.  The 2001 version did not

16   become effective until November 1st of 2001 when Michael was no

17   longer employed by Aegis.  The tax table in the 2000 sentencing

18   guidelines manual assigns an offense level of 25 if a loss

19   amount is greater than 40 million, but less than 80 million.

20             Your Honor, the 2000 manual in effect at the time for

21   the offense should be used as they are more favorable to Mike

22   than the current guideline and they more accurately reflect the

23   seriousness of the offense.

24             Moving on, your Honor, I'm following along with my

25   submission.  I'm going to try to be as succinct as I can in

1   this area.  This is the very, very important issue I think that

2   Michael could not reasonably foresee the loss amount of $60

3   million; that he could not foresee the ambit or the sheer

4   breadth of the loss amount.  And just for the sake of argument,

5   giving the government its argument that the loss amount is

6   calculated at the higher number of $50 million, that, of

7   course, is a mind-boggling, staggering number.  The Court

8   recalls that when Mike joined Aegis at his father's urging --

9   and, your Honor, Judge Norgle, I'm going to mention his father

10  from time to time during my presentation to you.  And maybe it

11  won't -- my words to his father or about his father may not be

12  flattering, but I don't mean to be disrespectful to the senior

13  Mr. Dowd, but I have to be an advocate for my client and I'm

14  going to do so.

15          Your Honor, the loss amount according again to the

16  government is in the neighborhood of about $60 million.  The

17  government in their submission says that Michael knew, could

18  foresee this loss amount because of his participation.  But

19  it's important to remember what his participation was.  Again,

20  we'll touch on it from time to time.  But we know that he

21  started there at Aegis in purely an administrative fashion.  I

22  don't know if it's fair to say that he was the water boy over

23  there, but he had strictly administrative tasks to perform,

24  ministerial-type tasks, administrative tasks.

25          The government seems to touch on the fact or tried to

1  touch on the fact during the trial that Michael knew about the

2  amounts that Aegis was sending offshore.  But again, it's

3  important to remember from the testimony of their witnesses,

4  from the testimony that was put up on the board, from the

5  documents that were admitted into evidence, it's clear that

6  Michael acted as a notary, that Michael sent documents to

7  Belize for those shelf trusts, made sure that they were paid on

8  time.  But at no time, Judge Norgle, did Michael ever prepare,

9  vet through the tax returns of the Aegis customers.  He never

10  prepared those tax returns.  He did not know the amounts of

11  money that were being put into those tax dodges and those

12  trusts overseas.

13          Now, I think the law is pretty boilerplate.  This is

14  something that comes up all the time over and over again in

15  cases, but what meaning do we have to attribute to these words?

16  Let me quote you the words that I consider to be basic hornbook

17  conspiracy law.  "In order to be held accountable" -- and this

18  is cited many times by the Seventh Circuit over and over and

19  over again in their decisions -- "In order to be held

20  accountable for the conduct of others, the conduct must have

21  been both in furtherance of the jointly undertaken criminal

22  activity and reasonably foreseeable in connection with that

23  criminal activity."

24          Your Honor, I direct your attention to I think what

25  is really just the gravamen.  The heart of that sentence is,

1    "reasonably foreseeable in connection with that criminal

2    activity."  And I respectfully submit to you that Michael was

3    not privy to those tax returns.  I'm not saying he was merely

4    an office boy.  Oh, they gave him a title.  He was made a --

5    signed an agreement that he was an administrator or a principal

6    of Aegis.  Your Honor, that I respectfully submit to you is

7    nothing but a mere a cynosure.  Nothing but a fancy title, at

8    the same low pay that he had from the very beginning that he

9    went to work there for.  The question is really:  What was

10   reasonably foreseeable to him, a 22-year-old young man, right

11   out of college?  No hiatus from college, no break, no nothing.

12   Went right work at his father's insistence.

13           I tried to come up with an analogy or an example of

14   what a 22-year-old would understand about the mind-boggling or

15   staggering amount of $60 million or $50 million, or even a

16   million dollars.  And, your Honor, it happened -- sort of a

17   light bulb went off when I was watching a news program during

18   the presidential election.  At the time Senator-Elect Obama,

19   now President-Elect Obama, had suggested there be a tax cut for

20   middle-class Americans, and the tax cut would take effect at

21   those middle-class Americans making $250,000.  And one of the

22   news programs, one of the reporters interviewed a young lady in

23   Columbus, Ohio where the election was really hotly contested

24   for those electoral votes.  And they asked this young lady, who

25   worked really as a domestic, as a cleaning lady, and she had

1    two jobs, she made maybe about $40,000 total, less than Michael
2    made.  They said:  "Well, what about this $250, this tax cut?"
3    She goes, "I don't think that's fair, $250,000.  I don't know
4    anyone who makes $250,000 as an annual income.  That is an
5    fantasmagoric amount, that is an incredible amount.  I think it
6    should start at $50,000 or $25,000, these tax cuts."  I think
7    that makes sense.  I think it makes a great deal of sense.
8            Because here it's the same thing, a 22-year-old young
9    man.  What is his understanding of the business world, of that
10   universe?  Could he possibly conjure up $50 million.  I think
11   if he knew that that was the amounts that Aegis was keeping
12   from the government -- I should say that's the tax loss to the
13   government -- I think that Michael would have left a lot sooner
14   than he left and would have maybe come to his epiphany that
15   something was wrong at Aegis.
16           Your Honor, another way to gauge one's understanding
17   or his -- whether or not the loss amount is foreseeable, citing
18   a Seventh Circuit case called Zarns.  I know the Court is
19   familiar with that also.  According to that case, the Seventh
20   Circuit, quote, "The most important factor in determining
21   reasonable foreseeability is the defendant's substantial degree
22   of commitment to the conspiracy's objective."
23           What was his degree of commitment?  Was he one of the
24   zealots who wrote these papers to the customers of Aegis,
25   telling them that they were right?  Was he the one who conjured

1   up the scheme?  Was he the one who planned the scheme?  Was he

2   the -- like Mr. Bartoli the so-called tax expert?  He executed

3   the scheme at their behest.

4           And whenever there was a question -- and I will talk

5   about this shortly again.  Whenever Michael had the slightest

6   doubt, the slightest skepticism -- because it's true.  It's

7   undeniable.  He admitted it on the witness stand.  He did know

8   about the Wall Street Journal articles.  He did know about the

9   cascading of audits.  Whenever those instances arose, he went

10  to his bosses.  And every time his bosses dispelled the notion

11  or the skepticism that Mike had about the legitimacy and the

12  lawfulness of the Aegis trust scheme.  I call it a scheme.  Now

13  it always was a scheme.  But they always dispelled it.  There

14  is no way, your Honor, that Michael was a committed zealot to

15  that scheme or a committed co-conspirator to that scheme.

16  Again, his jobs or his tasks -- again, I urge the Court to

17  consider and I know the Court remembers -- were purely

18  administrative, were purely ministerial.

19          At one time, I think it was -- I don't recall if it

20  was during cross-examination or not, but during one of the

21  seminars that was held in Belize Mike was at the beach, or

22  another time he was passing out pencils and writing

23  instruments, I'm sorry, pencils and pens and tablets to take

24  notes on.

25          (Pause.)

```
1            MR. MECZYK:  May I move on, your Honor?

2            THE COURT:  Yes.

3            MR. MECZYK:  Thank you.

4            A two-point upward adjustment for sophisticated

5     means.  With all due respect to the probation officer who

6     prepared a very, very thorough PSR, your Honor, we would object

7     to the upward adjustment for two points because of a

8     sophisticated means.

9            Again, your Honor, it is -- the Court looks to the

10    individual defendant and they look at the decisions, at least

11    in the Seventh Circuit, and other circuits have looked to the

12    individual's personal involvement.  Again, as I said earlier,

13    his personal involvement was purely administrative.  He is not

14    the architect, he is not the planner, he is not the brains, he

15    is not the prime mover of the Aegis scheme.  He was doing as he

16    was told.  He did not invent the scheme at 22 years old, 23

17    years old, 24 years old.  He was told to do and was following

18    what his superiors told him to do.  He was obedient.  And that

19    is another theme I will shortly touch upon.

20           Another case that we quote in our submission is

21    United States versus Bhagavan, I don't know if I'm pronouncing

22    it correctly or not, B-H-A-G-A-V-A-N.  It is a F.Supp. opinion.

23    But again, in that case, your Honor, the defendant was just

24    like Michael who did not engage in conduct held to constitute

25    sophisticated means.  There was nothing sophisticated.  There
```

1   was nothing special about Michael's involvement.

2         Your Honor, the government seeks a two-point upward

3   adjustment for obstruction of justice, and that certainly is

4   not warranted.  You would have to find that Michael when he got

5   on the witness stand beside you, just a chair away, committed

6   perjury.  For Michael, your Honor, committing perjury is not

7   just -- is more than we in the secular court consider a wrong,

8   a crime.  To him it's more, to him it's a mortal sin.  But

9   before I talk about that, the law as far as obstruction of

10   justice in this circuit has to obstruct or impede the

11   administration of justice with respect to the prosecution of

12   the instant offense.

13         Your Honor, in no way was Michael Dowd's testimony in

14   this courtroom, in no way did it thwart the government's

15   prosecution in this case.  All they have to do is cross-examine

16   him, which they did.  But they weren't impeded, they weren't

17   thwarted, they weren't stopped in any way.

18         Now, it's true, is a jury conviction after a person

19   testifies in his own defense, is that tantamount to perjury?

20   Well, it is not tantamount to perjury.  I am sure this jury --

21   and I know this jury was a very intelligent jury, I cannot

22   presume otherwise, it would be wrong as an officer of the court

23   to presume otherwise.  But there were instructions that I think

24   were difficult, difficult for even lawyers to really comprehend

25   and not do mental gymnastics.  One is:  Did Michael have an

1    unreasonable good-faith belief in the Aegis trust scheme?  I

2    think that asks a lot of a jury.  I think maybe that's why

3    there was a conviction.  I noticed that one of the jurors is

4    here in court today.  Certainly we can't ask him to come up

5    here and impeach a verdict or talk about what he thought, but I

6    think it's not presumptuous and I don't think it's unfair for

7    me to submit to you that maybe this jury thought that after all

8    the red flags went up and all the warnings came up that Michael

9    began to have an unreasonable belief.  An unreasonable belief,

10   I think to any man, to any woman, even if it's good faith, is a

11   very, very big hurdle to jump over.  I don't think it's

12   perjury, your Honor.

13           I want to direct your attention to one of the

14   missives that were sent on behalf of Michael.  This is from

15   Kenneth Corey.  I'm familiar with your Honor's procedures and

16   I'm more than confident that I don't have to quote these

17   letters verbatim because I'm confident that you have read

18   through every one of them.

19           But it's worth just repeating what Father -- what

20   Kenneth Cory, he's an instructor at a Catholic college, St.

21   Thomas More Academy in Michigan, wrote about Michael, who is

22   his godson and his nephew.  I just want to quote this.  "Your

23   Honor," he writes to you, "Michael's character deserves special

24   mention.  He is a serious practicing Catholic.  By "serious," I

25   mean he knows and cares deeply about Catholic doctrine and

1  moral teachings.

2       "I wish to point out that the church relying on holy

3  scripture forbids oath-taking except for grave matters such as

4  court cases.  Michael took an oath on which he solemnly swore

5  to tell the truth.  Taking an oath means that one is calling on

6  God to witness the truth for what is being said.  For that

7  reason, to say anything but the truth under those circumstances

8  is to call on God to witness a lie.  In other words, it's to

9  make God into a liar.

10      "For that reason the church teaches that perjury is

11  to employ an old and almost forgotten Catholic word, but one

12  that Michael knows full well, a mortal sin.  Mortal sin is

13  punishable by eternal damnation."

14      Now, I know, your Honor, we are not here in this

15  courtroom in a country that takes the First Amendment -- I was

16  going to say seriously, but as the cornerstone of our

17  democracy.  But we do believe in God, and I think it's

18  necessary that we touch upon this.  Not so much that we are

19  talking about religious issues, but we are talking about the

20  individual who stands before you today.  We know that Michael

21  has very, very profound religious convictions.  This is a

22  person who went to work at Aegis every day driving from his

23  home in Glenview to the southwest suburbs saying the rosary.

24  This is a person who was an altar boy until his -- even as an

25  adult, not an altar boy -- pardon me, Michael -- as --

1 performed at the altar.  Michael is a devout Catholic.  It

2 stretches -- it is incredulous.  It stretches credulity to say

3 that suddenly one day in Michael's life he got on the witness

4 stand and he dissembled and he committed perjury.

5       That is not the Michael Dowd, your Honor, that you

6 know and the Michael Dowd that everyone else in this courtroom

7 knows and the Michael Dowd who everyone wrote to you about.

8 Again, I would respectfully submit to you that Michael Dowd,

9 that as far as he is concerned, would not commit a mortal sin,

10 but would not commit perjury in your courtroom.

11      Your Honor, without being redundant, we already know

12 what Michael Dowd's role or participation in the Aegis company

13 was.  Again, I respectfully and humbly submit to you that

14 Michael Dowd deserves and merits a four-point downward

15 adjustment for his role in the offense.  Your Honor, his

16 participation was minimal.  Oh, I can anticipate what my

17 adversaries are going to say shortly to you about what he did.

18 But it is uncontroverted, it's unchallenged that Michael was

19 not the brains.  He was not a Bartoli.  He was not a Vallone.

20 He wasn't anywhere near the level that those people were

21 involved in.

22      Again, at 22 he started as an office boy.  Because he

23 was so good at what he did, he was given promotions -- of

24 course, never given a promotion with more salary -- and, of

25 course, your Honor, was given one of the great perks of the

1  Aegis corporation, one of the great benefits for working there
2  was giving -- as Mr. Cover told him, we gave Michael a trust.
3  We gave him his own trust so he can send some of his paltry
4  salary off to Belize.  That was in the testimony, your Honor,
5  and of course in my argument.  He had a fancy job title, but
6  that's about it.  As I said, nothing but a cynosure.
7          Your Honor, he had no knowledge about trusts, taxes,
8  offshore accounts, IRS rules or IRS regulations.  Again,
9  whenever there was a question, a doubt, some skepticism, some
10 cynicism, Michael would run to the people that he trusted, that
11 he was told to trust and took their word for that.  Albeit
12 foolishly, albeit naively, an immature 22- and 23-year-old.
13 His role, your Honor, again was minimal.
14         This is -- I suppose this is all nuance of course
15 because the next issue is a downward departure and -- the loss
16 amount, please, interrupt me if you must, if you have any
17 questions during my presentation.  I don't want to gloss over,
18 I hope I'm not glossing over what I consider to be
19 extraordinarily serious and extraordinary issues of great
20 moment, and those are these departures.  I don't want to repeat
21 myself, that's my fear, but his role is truly a minimal role
22 and should be given every consideration for that role.
23         Your Honor, I'd like to address, if I may, with you
24 the loss amount that I respectfully submit overstates the
25 seriousness of the offense.

1          The amount attributed to the scheme and Michael's

2    participation, or his role in the scheme is grossly

3    disproportionate because it overstates the seriousness of the

4    offense.

5          Moreover, your Honor, the Seventh Circuit has stated

6    that when the loss amount overstates the seriousness of the

7    offense, it is, to quote the Seventh Circuit in the United

8    States versus Corey "an encouraged basis for departure,"

9    unquote.  And one, the Court must consider -- District Court

10   must consider the nature and circumstances surrounding the

11   offense and the offense level is determined -- I'm sorry, let

12   me untwist my tongue.

13         The loss amount which the government has calculated

14   to be over 50 million vastly overstates Michael's culpability

15   and produces a guideline sentence, that as I said, is grossly

16   disproportional, is way out of whack, to use common parlance,

17   to his relatively minor participation in the offense.

18         Your Honor, Michael had little or no knowledge of the

19   amount being taken.  And I think it's best said -- there was a

20   case, a similar submission, United States versus Nachamie.

21   I'll spell it for the benefit of the court reporter,

22   N-A-C-H-A-M-I-E.  Where the Judge referred to Michael in

23   similar circumstances, a late comer to the conspiracy, as

24   Michael was, he called the defendant in that case, the Judge,

25   it's very prescient, he called him an accidental criminal.

1  It's not as though in the garden variety conspiracy where

2  everyone gets together and they decide to violate or agree to

3  violate a law of the United States.

4          This young man at the urging -- at the legitimate and

5  well-meant urgings of his father became an accidental criminal

6  by working with people who did scheme and who did conspire to

7  violate laws of the United States.

8          Did they corrupt Michael?  I would respectfully say

9  no.  But he was aiding and abetting in their scheme -- at some

10 point, your Honor -- at all times I should say -- unwittingly.

11         Your Honor, now I would like to address another

12 subject area.  In our submissions we -- I have suggested to the

13 Court that a downward departure based on parental influence,

14 but I termed it imperfect duress or coercion is appropriate

15 here.  Now, I styled it or I put it under the rubric of

16 imperfect duress because no one put a gun to Michael's head.

17 It's not as though someone stood behind him and told him you

18 have to commit offenses.  There is an imperfect duress.  I

19 think 3553 would recognize that.  It doesn't rise to the level

20 of a trial defense, that's why it is an imperfect duress.

21         Moreover, after I submitted our position paper to

22 your Honor, it dawned on me that there was something more than

23 imperfect duress in this case, or at least when it came to

24 Michael.  And I again would respectfully submit that there is

25 more, that there is actually a diminished capacity.  Now, you

1   may look at me now standing at the lecturn and say, Mr. Meczyk,

2   maybe you are diminished or maybe crazy in some way to even say

3   that here.

4          But, your Honor, there is an element that comes out

5   in our submission that while I was working on this case and

6   reading the letters that were submitted to you, especially from

7   one of the Catholic priests who was Michael's pastor.  I saw

8   that there was more than just duress.  I know that you've heard

9   from the testimony that Mike's dad sort of planned his life for

10   him.  Mike wanted to be and was interested in aviation, wanted

11   to be a pilot.  Mike's father, to his credit too was a

12   businessman, worked for New York Metropolitan Life, pension

13   work.  And he thought that it would be best for his children

14   and best for his son to follow a path or a career, or a path

15   that he chose, and that would be in the business world.  Mike

16   was the dutiful son, the obedient son.  But this obedience,

17   your Honor, almost takes on a pathological quality.  I hope I

18   chose the right word, but it's the best one I can come up with.

19          Mike grew up in a home where his father, according to

20   his sister's letter to you, ran the home like a boot camp.

21   Certainly not a violent man, his father was a well-meaning man,

22   provided for his family, but ran the home in a imperious way,

23   He was autocratic.  I even hate to use words like this.  I'm

24   loath to use words like this.  But they are what they are.

25          THE COURT:  Do you want to use the Great Santini?

1      MR. MECZYK:  Yes, your Honor.  I remember that movie

2   too.  I remember the Great Santini.  I don't remember whether

3   or not it's in any of the letters I read, but that's a very,

4   very good analogy, your Honor.  It's a great analogy.

5      THE COURT:  I just proposed it to you, it's not mine.

6      MR. MECZYK:  And I accept it, your Honor, because

7   it's great because I remember the movie with Robert Duvall.

8   Robert Duvall was the Marine pilot who was imperious and wanted

9   his sons to follow in his footsteps.  I'll never forget that he

10  wanted to win so bad at basketball that he took the basketball

11  and bopped it over his son's head.

12      I don't know if it's quite that extreme, but I do

13  know this, your Honor, that it was a household that demanded

14  obedience, strict obedience, and filialty to the parents.

15  There's nothing wrong with that, certainly not in this society.

16  But maybe it might have conditioned Mike.  Again, I'm loath to

17  use the word brainwash.  But I don't blame Mr. Dowd, but the

18  Dowds did belong to a church that was a schismatic church, and

19  that was in Oak Park at the time.  They were followers of

20  Father Marcel LeFave who rejected Vatican II, rejected -- I'm

21  sorry, and the group, I'm going so far as to even say almost a

22  cult-like group was the Pope Pius X Society.  We hear about

23  Opus Dei.  Opus Dei adhered to the pronouncements of the Holy

24  See.  They are devout Catholics.

25      But this is a group, your Honor, that is -- has been

1  excommunicated by the Holy See.  This is a group, your Honor,

2  that preaches and teaches strict obedience to this group, not

3  to the Holy See in Rome, but just to this group and their

4  pastor, the Reverend Marcel LeFave, a French Catholic who felt

5  that the Roman Catholic church was drifting too far to the left

6  and that they were the true religion.

7        Your Honor, in that regard, I would just like to -- I

8  don't want to call it digression, that would be terrible, but I

9  would like to call, if I may with your consent -- I guess I

10 will digress for one moment.  Because there was one letter,

11 your Honor, and actually, it sort of lays out my argument and

12 it lays it out more articulate that I could ever be.  That's

13 from a good friend, the former next door neighbor of Mike Dowd,

14 Mr. Harry Brandt, who was on the board of trustees at the

15 Chicago Board of Options.  Himself a very, very successful

16 businessman and Mike's and his folks' next door neighbors.

17        And he states that when he grew up with Mike that

18 Mike was obedient to his parents and he was -- he said that if

19 we were blessed with another child, Sharon and I would have

20 been pleased to have a son like Michael.  He was every parent's

21 dream of a "straight arrow kind of a boy.  This straight

22 arrowness comes from his wonderful upbringing actually by his

23 mom and dad."

24        But he does go on to state this, "Phil and Marie

25 were" -- quoting from him again -- "true believers in the

1  legality of the Aegis program and I knew that I could not

2  change their minds about the subject.  It is my belief that

3  Phil and Marie convinced Michael that the Aegis trusts and all

4  the other documents were legal and proper."

5          THE COURT:  Some of your observations are consistent

6  with the letter of June 16, 2008 submitted by Reverend John

7  Cantius.

8          MR. MECZYK:  Yes.

9          I would, with your consent, call to the witness stand

10  very briefly the pastor.

11          May I have one moment, please?

12          THE COURT:  Are you saying the author of that letter?

13          MR. MECZYK:  Your Honor, I beg your pardon?

14          THE COURT:  Are you saying you want to call the

15  author of the letter?

16          MR. MECZYK:  Yes, I do.

17          THE COURT:  Well, there's no point in it because his

18  entire statement is contained within the letter.

19          MR. MECZYK:  Well, very well, your Honor, but --

20          THE COURT:  I understand your point.  You are

21  suggesting somehow --

22          MR. MECZYK:  Yes.

23          THE COURT:  -- as you argue blind obedience.

24          MR. MECZYK:  Yes.

25          THE COURT:  Obedience to a fault.

1          MR. MECZYK:  Yes.

2          THE COURT:  I have drawn inferences from what you

3   have said.

4          MR. MECZYK:  Thank you.

5          THE COURT:  I will take into account this letter.

6          MR. MECZYK:  Your Honor, thank you.

7          THE COURT:  Now, if there is something not contained

8   within the letter, that would be in addition to the letter,

9   then you may call the witness.

10          MR. MECZYK:  Respectfully, your Honor, may I have one

11   moment, please?

12          THE COURT:  Yes.

13          MR. MECZYK:  Thank you.

14      (Pause.)

15          MR. MECZYK:  Your Honor, the Father will

16   essentially -- Father Frank Phillips was very gracious to come

17   here to court today because he was the pastor at the St. John

18   Cantius Church.

19          THE COURT:  Cantius Church.

20          MR. MECZYK:  That's correct.

21          Which brought back into the fold the

22   excommunicated parishioners who were in the -- who were

23   followers of the Pope Pius X church and group.  So he can tell

24   you his own involvement.  It just bears again repeating -- and

25   not to waste your valuable time -- that he thought that these

1  people -- I'm not looking at his letter right now, but it's so
2  salient a point -- that these people or some of these people
3  were incapable of thinking for themselves.
4          And that's what might have happened to Michael, that
5  his obedience to the church, to this group and then to his
6  father, he was so conditioned, so brainwashed, this level of
7  obedience rises to another level, and it is pathological.  I
8  don't know if it's pathological, maybe that's wrong.  But this
9  obedience was so great and so profound that if Michael were to
10 walk away from Aegis, if Michael were to just quit, it just
11 simply wouldn't be disobedience to a parent, it would rise to
12 the level again of a mortal sin.  Because here disobedience is
13 disobedience and disrespect for one's parents.  And disrespect
14 for one's parents is tantamount to a violation of the Fourth
15 Commandment to Michael.  And the Fourth Commandment is:  Thou
16 shall honor thy mother and thy father.  He would be committing
17 a sin, that's how he was conditioned.
18         Your Honor, in that light and that vein I would like
19 to call a witness who did not write a letter, who has studied
20 the Pope Pius, is very well-acquainted with the Pope Pius X
21 Society.  He is a canon lawyer.  He served with the Archdiocese
22 of Chicago.  He has taught in Canada, and he has written
23 articles extensively about the Pope Pius X Society.
24         I would like to call Father William Westman to the
25 stand to briefly give you maybe a thumbnail sketch, if you

1   will.

2            THE COURT:  What is your proffer?  You make the

3   thumbnail sketch.

4            MR. MECZYK:  Your Honor, I beg your pardon?

5            THE COURT:  What is your evidentiary proffer as to

6   what he is going to say?

7            MR. MECZYK:  My proffer is that the Pope Pius X

8   Society was a very, very ultra conservative, schismatic group.

9   They broke off from the Roman Catholic church.  They thought

10  that the Roman Catholic church was too liberal.

11           Their central tenent is obedience.  Obedience not to

12  the Holy See in Rome, but obedience to this particular group of

13  people.

14           Your Honor, they go so far as -- I'll proffer --

15  Father Westman, could you stand, please.  Thank you, Father.

16           Your Honor, if I may introduce to you Father William

17  Westman of the Archdiocese of Chicago.

18           THE COURT:  You have -- good morning.

19           You have made your point.  This is becoming redundant

20  and repetitious.

21           MR. MECZYK:  I understand.

22           THE COURT:  I understand the concept that you are

23  offering in terms of mitigation.

24           MR. MECZYK:  Yes.

25           THE COURT:  Not as a defense in the case --

```
 1              MR. MECZYK:  Yes.
 2              THE COURT:  -- because obviously the jury has found
 3   your client guilty of multiple charges beyond a reasonable
 4   doubt.
 5              MR. MECZYK:  Correct.
 6              THE COURT:  But you are offering this as some form of
 7   mitigation and I understand your argument and you have made
 8   your point.
 9              MR. MECZYK:  Your Honor, thank you.  I'll move on
10   then.
11              THE COURT:  Let's move on.
12              MR. MECZYK:  Thank you.
13              May I have one moment, please?
14              THE COURT:  Yes.
15              MR. MECZYK:  Thank you.
16          (Pause.)
17              MR. MECZYK:  Your Honor, I'm reminded by my
18   colleague -- I know this again is a digression -- but Michael
19   started in 1999 and wasn't active until much later.  That was
20   my point there, an 18-month period.
21              May I go on, your Honor?
22              THE COURT:  Yes.
23              MR. MECZYK:  Thank you.
24              Your Honor, you are correct to say -- and again, I
25   don't want to be redundant -- it is not a defense that I am
```

1  propounding to the Court.  That's why I call it imperfect

2  duress, imperfect diminished capacity.  They are not defenses.

3  They are solely for the purpose of mitigation, and you are

4  correct.

5          Your Honor, there is one letter that follows up with

6  that too.  I know you're familiar with this letter.  This is

7  from the Reverend Monsignor Richard Sossaman, who is in the

8  Vatican, who knows -- who knew Michael very well.  And again,

9  he again talks about this categorical obedience.  He quotes --

10  I quote his letter to you, "I'm completely certain that Michael

11  would not have been critical of superiors' decisions, but

12  rather trusting of their judgment in matters before the

13  business enterprise."

14          It is -- I think the picture is clear what kind of

15  individual Mike is, a law-abiding person.  And there is

16  another -- I was going to actually close, but I'm not ready to

17  do so.  I appreciate your patience.

18          Your Honor, there is another matter too that I think

19  is very important for purposes of mitigation.  And I would

20  respectfully submit also to you that as you well know, since

21  Aegis was shut down, Michael of course took flying lessons and

22  became an airline pilot.  We all know now that 50 souls or 100

23  souls entrust their lives, who did entrust their lives to him,

24  not anymore because now that's one of the collateral

25  consequences of his conviction.  Not only is he stigmatized for

1  the rest of his life as a convicted felon, but he has lost the

2  thing that he loves, next to his religion and his family, more

3  than anything in his life, and that's to be a pilot.

4         Now, they have not taken his commercial license.  The

5  FAA has not revoked his license, that's sort of in limbo, so to

6  speak.  But he is no longer employed with Northwest Airlink.

7  His dream of becoming a captain for a major airline is now

8  gone.  So there is a lot of collateral fallout, if you will.

9         But there is one incident of Michael's life that --

10  it's called extraordinary rehabilitation.  I know that's sort

11  of -- it's not really right to say rehabilitation.  Pardon my

12  temerity, Judge, but I don't know if he has to be

13  rehabilitated.  But there is one event in his life, probably

14  maybe representative of what kind of person Michael is, because

15  there was a letter that you received from a 747 captain who

16  flies for United.

17         Mike tells of an incident where Mike is with an

18  inexperienced co-pilot and they can't get their nose wheel down

19  for landing.  They go through their checklist and they do

20  everything on their checklist and that nose wheel isn't coming

21  down.  Michael then asks the tower to see whether or not --

22  because he can't see the nose wheel below the cockpit, to fly

23  around and they confirm the fact that that nose wheel hasn't

24  gone down.

25         Michael thinks of everything.  He wants to avert --

1    which could be very, very dangerous and maybe lead to tragic
2    consequences -- a belly landing, would certainly cause a fire
3    and certainly cause a great deal of panic on the aircraft.
4            Michael thought outside of the box.  He was very
5    quick.  He suggested he grab the controls, he pulled the plane
6    up and took it into a steep ascent, and gravity or G forces --
7    I'm not a pilot and I'm certainly not an engineer -- but from
8    what I'm told, that forced the wheel to go back in.  Nothing in
9    this checklist -- bring the wheel down, I'm sorry, and he
10   landed that plane safely.  That's the kind of a talented pilot
11   Mike is and what a wonderful and concerned person Mike is.
12           And, your Honor, there is a theme that runs through
13   all the letters that you received, that Michael is an
14   individual who cares about family, who cares about his friends
15   and cares about his neighbors and cares about children.  When
16   someone had a sick child, a gravely sick child, he offered his
17   blood and he gave a transfusion.  Michael loves children, his
18   friends' children, his neighbors' children.
19           Much was made about the fact during the trial that
20   Michael took his illicit earnings and went to France with it.
21   But he went to France with it with the Carlson family because
22   they invited him because he would look after their small
23   children because that's how much Michael loved children.  And
24   unfortunately now, if you were to sentence him to prison, at
25   least what the government suggests that you sentence him to,

1  his chance, his prospects of marriage, of having a family at

2  his age are pretty dim.  Especially, for a barbaric or

3  Draconian sentence that sometimes these guidelines demand.  So

4  the collateral consequences, the collateral punishment, it's

5  already here, your Honor, it's already been visited upon Mike.

6         Under 3553 one of the dictates to the District Judge

7  is that your sentence has to have a deterrent factor, of

8  course, without repeating all the criterion, but also that it's

9  a sentence that must show respect for the law.  I want to

10  quote -- and of course this is the quote that was in the most

11  recent case, the most recent decision by the United States

12  Supreme Court considering the guidelines to be advisory, which

13  is the seminal decision in Gall versus United States.  Judge

14  Pratt was the District Court Judge in Iowa who I had the

15  pleasure of listening to several weeks ago at a sentencing

16  seminar.  I want to quote the Judge.  I wrote down what he

17  said, that "Imprisonment" -- this is to quote His Honor, Judge

18  Pratt, -- quote:  "works to promote not respect, but derision

19  of the law."

20         I think that people in the audience, citizens of this

21  country -- pardon me, your Honor -- know what kind of person

22  Mike is, know that kind of individual he is, know the strength

23  of character that he has.  I think that they would be

24  astounded, I think that they would be shocked, and let's go so

25  far as to say they might be appalled to learn that under the

1   advisory guidelines that a person like Mike for what he did is

2   to be sentenced -- to use my words -- to what I would call a

3   savage sentence, ten years plus for this conduct.

4          Your Honor --

5          THE COURT:  Do you think it would help those people

6   who might have those concerns if they had heard the three

7   months' of evidence in the case?

8          MR. MECZYK:  Yes, your Honor, I do.

9          I'm not being facetious.  I think that if they would

10  have heard Mike's testimony, maybe they would have said, you

11  know, Mike, you should have quit, you should have quit when you

12  knew about the audits, the cascading of audits, about the

13  letters, but they knew what his involvement was.

14         Your Honor, it's not only the cold record, if they

15  have read the record, but if they sat in this courtroom and

16  they saw Mike's demeanor when he testified on direct

17  examination, on cross examination, they saw how sincere he was.

18  And I would state to you that he was the epitome of similitude,

19  not dissembling, but the epitome of the truth.  That he is

20  guileless.  He does not know about lying.

21         Your Honor, I'm also aware of your very measured

22  comments during the sentencing of Mr. Cover.  I know that you

23  quoted the Omole case -- I don't know if I'm pronouncing it

24  correctly -- O-M-O-L-E, which was decided April 15th by the

25  Seventh Circuit.  I believe -- and please correct me if I'm

1    wrong -- I believe that you stated that that case would somehow

2    not allow the Court to give a variance from the guidelines, as

3    your hands were tied.

4              Again, I think it bears remembering about the Omole

5    case that the District Court Judge, His Honor in this

6    courthouse, His Honor Judge Guzman, gave an extraordinarily

7    lenient sentence, and said, "You really don't deserve this

8    sentence," and castigated the defendant before him and gave him

9    a lenient sentence.

10             The Seventh Circuit said:  "That's okay, your Honor,

11   Judge, but you have to justify it."

12             And I think, your Honor, with all due respect, I have

13   given you not ample justification, but abundant justification.

14   I'm going to end with this if I may.

15             I remember years ago in school --

16             THE COURT:  Let me give you the citation on the Omole

17   case to which you have referred.  United States versus Omole,

18   523 F.3d 691 at pages 698-699, a Seventh Circuit decision,

19   2008.

20             MR. MECZYK:  Thank you, your Honor.

21             I don't mean to be presumptuous, but I'm not

22   surprised that you would have it at hand at all.

23             THE COURT:  Proceed.

24             MR. MECZYK:  Your Honor, I remember one of my classes

25   in college, I think I got a C in the class, so I went -- I

1   remember one of the assigned readings.  It was Melville's Billy

2   Budd.  Billy Budd was an allegory.  It was actually a religious

3   allegory about a young man who was pressed into the service of

4   the British navy because his ship is overtaken by a British

5   man-of-war.  There was a young, innocent young man, 21, 22

6   years old, Billy Budd, he was a merchant sailor.  But he was

7   pressed, ordered into the service of the British crown and to

8   the British navy.  I couldn't help but look at Billy Budd again

9   and think of Michael Dowd.  There is certain similarities

10  between the protagonist in that book and Michael Dowd's

11  predicament here in court today.

12          When pressed into the British navy, he -- I'm sure

13  you even know that book.  I have no doubts, your Honor.  When

14  Billy Budd was pressed into the navy, literally drafted, forced

15  off his merchant ship to serve in the -- on a British

16  man-of-war, he was well-loved by everyone, but he was told to

17  do certain things by the older, more wiser, not wiser, more

18  corrupt sailors.

19          And there was a mutiny, they were planning a mutiny.

20  Billy didn't really want to have anything to do with it and he

21  was accused by one of the petty officers of being a mutineer,

22  and brought before his commander.  Billy had nothing to do with

23  the mutiny and tried to express himself, but began to stutter

24  because he was a very nervous fellow.  He involuntarily struck

25  Claggart, the petty officer.  He struck his head and killed

1    him.  Now he was up on charges for murder, even though it was a
2    manslaughter, they knew it was a manslaughter, and Billy,
3    supposedly in Melville's fiction, was almost a saint.
4            I'm not saying that Mike is a saint, but he certainly
5    has great virtues.  And Billy Budd had great virtues, but Billy
6    Budd was found guilty by a martial court, a drumhead court they
7    called it, and hung from the yardarm, from the yardarm of the
8    great ship.  But, you know, that caused a mutiny almost, your
9    Honor.  That caused a rebellion among the sailors because they
10   thought that the law, that the sentence pronounced was too
11   harsh.  That caused a derision in the law.
12           I don't know why I stumbled on Billy Budd, but I
13   thought it was pretty apposite to the circumstance; that you do
14   have the power, you do have the authority to depart that I
15   would say, submit to your Draconian guidelines.  That Michael
16   Dowd is deserving of leniency.  Michael Dowd is deserving of
17   mercy.  He merits it, your Honor.  Yes, he made a mistake.  I'm
18   not here to challenge that or quarrel with that.  He made a
19   mistake.  And he is contrite and he is remorseful.
20           Your Honor, I would even ask you, I would go so far
21   as to not only consider a variance, but also a departure on
22   acceptance of responsibility.  He's accepted responsibility.
23   Maybe he will, when called to give his allocution, he will tell
24   you why he thinks he is deserving of it.  But I would
25   respectfully submit to you that he is deserving of it, because

1  he knows he committed wrong, that he should have been more

2  mature earlier and woken up earlier.  And maybe because of that

3  diminished capacity he couldn't.

4        But, your Honor, I know this is a tough one.  I do

5  realize that.  But, your Honor, if ever there was a case, if

6  ever there was a case at all in this courthouse with a

7  defendant like this for what he did, probation is the right and

8  just sentence.

9        Thank you for your consideration.

10        THE COURT:  Mr. Elden or Mr. Heinze.

11        MR. ELDEN:  Your Honor, the fundamental point that --

12        THE COURT:  Before you get to that fundamental point,

13  you also submitted the government's response to Dowd's

14  sentencing memorandum, and you filed it on November 6th.

15        MR. ELDEN:  That is correct, your Honor.

16        THE COURT:  I have it and I have read it.

17        Nevertheless, you may argue as you see fit.

18        MR. ELDEN:  Thank you.

19        Your Honor, the fundamental point that counsel is not

20  recognizing is that the defendant was found guilty on six

21  counts.  He was found guilty of conspiracy to defraud the

22  United States and to commit offenses against the United States,

23  mail fraud and four counts of filing false tax returns.

24        Counsel said that Mr. Dowd acted unwittingly at all

25  times.  The verdicts of the jury are that he acted willfully at

1   the times charged in the indictment.  And for Counts 52 through
2   55, those involved his individual tax returns for tax years
3   '97, '98, '99 and 2000.  He acted willfully.  He was using the
4   Aegis system.
5            Counsel is mistaken when he says that Mr. Dowd began
6   his employment at Aegis in 1999; he did not.  He began in
7   January of 1997.  Mr. Dowd will acknowledge that right now,
8   Judge, if you have any doubt about it, he began in 1997.  As
9   soon as he began, he got an Aegis trust return, and he used
10  that trust return.  He filed a tax return for that trust
11  return.
12           THE COURT:  That's Count 52?
13           MR. ELDEN:  Yes.
14           And the jury found that he acted willfully.  So he
15  joined the conspiracy, acted willfully, aiding and abetting the
16  Aegis scheme from 1997 until 2001.
17           So the -- in terms of his participation in the
18  scheme, he is accountable for the losses for all of those
19  years, '97, '98, '99 and 2000.  So that's how we get the loss
20  figure for those years.  He was working there those years --
21           THE COURT:  Now, let's just start --
22           MR. ELDEN:  -- and 2001.
23           THE COURT:  Let's just start with that figure then.
24           Your position then is for those four years' of work,
25  the tax loss for which the defendant is accountable for

1   sentencing purposes is the $50,085,851 rather than the 60

2   million that was applied --

3          MR. ELDEN:  Yes.

4          THE COURT:  -- with respect to other co-defendants?

5          MR. ELDEN:  Yes, it's actually five years.  That

6   those five years, '97 through 2001 inclusive --

7          THE COURT:  Yes.

8          MR. ELDEN:  -- he was working for Aegis during those

9   years, beginning in '97, and he acted willfully during those

10  years.  He knew the system was fraudulent.  That is a necessary

11  conclusion from the jury's verdict on Counts 52 through 55.

12         Now, Judge, as mentioned, the applicable guidelines

13  are the guidelines in effect at sentencing.  And that is, as we

14  note in our memo that is required by statute, the statute is

15  constitutional and therefore the Court does not have discretion

16  to disregard the statute.

17         On the issue of foreseeability, we attached to --

18         THE COURT:  All right.  So let me make a point here.

19         MR. ELDEN:  Okay.

20         THE COURT:  The guidelines that will be imposed, or

21  used by the Court as advisory, no longer mandatory, are the

22  ones that are in effect today.

23         MR. ELDEN:  Yes, your Honor.

24         THE COURT:  Yes.  So ordered.

25         MR. ELDEN:  Now, on the issue of the foreseeability

1  of the loss, the defendant knew that there were hundreds of

2  clients.  He worked closely with the clients of Mr. Cover, who

3  managed clients.  He knew there were other managers around the

4  country, not just in the Chicago area.  Mr. Dunn was in

5  Indiana.  He was aware of others in Ohio, Homer Richardson.

6  And he was aware that Aegis had clients throughout the country.

7          We attached to our memo a list that Mr. Dowd put

8  together in March of '99 of 90 clients were under scrutiny of

9  the IRS.  So he knew at that time that 90 Aegis clients were

10  under scrutiny by the IRS, either audit or there were

11  inquiries.

12          THE COURT:  That's Exhibit A?

13          MR. ELDEN:  Yes, your Honor.

14          And he had to know that there were other clients who

15  were not under scrutiny.  So he knew that there were hundreds

16  of clients.  He also knew that there was substantial tax

17  reduction from the Aegis system each year by each client.

18          MR. MECZYK:  Your Honor, I'm going to object.

19          MR. ELDEN:  There's correspondence --

20          MR. MECZYK:  I'm going to object.  With all due

21  respect to Mr. Elden, I object because that is not a true

22  statement.  It's not borne out by the evidence of this case,

23  Maybe you will give me a chance to rebut this, but I want to

24  state my objection and vigorously want to state it.

25          THE COURT:  You may respond to the argument.

1       MR. MECZYK:  Thank you, your Honor.

2       THE COURT:  Respond to the objection, I mean.

3       MR. ELDEN:  Yes, your Honor.

4       He was involved with the clients of Mr. Cover.  He

5 would set up, like he set up for himself, how various parts

6 of -- various income would be set forth in different checking

7 accounts for those clients.  We put those in exhibits, Judge,

8 and put those exhibits up on the screen and introduced them

9 into evidence.  He knew how these clients' income and expenses

10 were being handled.  He worked on it with those clients.  He

11 knew, therefore -- he knew from his own system and his own

12 returns that the income was being sheltered, was not being

13 reported to the IRS.  It was going into the trust system and

14 therefore was -- never got to the IRS.

15      We introduced evidence, Judge, of correspondence that

16 Mr. Dowd had with Mr. Jenkins in Belize.  We introduced

17 hundreds of emails.  Those emails concerned the sheltering of

18 money offshore.  In one email they discussed millions of

19 dollars.  And with all of that, he was well aware of the

20 millions of dollars going offshore with his correspondence with

21 Mr. Jenkins.  He was the primary person who had correspondence

22 with Mr. Jenkins.  And he was aware of all that money going

23 offshore.  He was aware of all of the clients and he was aware

24 of their substantial thousands and tens of thousands of dollars

25 in tax reductions per client per year.  So that when you add it

1 all up, he knew that there were millions of dollars that

2 were -- that the government was being defrauded of because of

3 the Aegis system.  He knew it for the five years that he was

4 participating in this fraud.  Millions of dollars in tax losses

5 were foreseeable to him, and therefore, it was reasonably

6 foreseeable that there would be a $50 million tax loss.

7           Judge, before I go on to this.

8           Judge, with respect to sophisticated means, the

9 relevant conduct guideline applies not only with respect to the

10 loss and the base offense level, it also applies with respect

11 to specific offense characteristics, including sophisticated

12 means.

13          In other words, the defendant is accountable and

14 responsible for his own acts, acts that he aided, abetted and

15 willfully caused, and reasonably foreseeable acts in

16 furtherance of the jointly undertaken criminal activity.  And

17 sophisticated means were definitely foreseeable to him.  He

18 aided and abetted sophisticated means, and in fact he

19 participated in sophisticated means.

20          "Sophisticated means" is defined as the use of

21 fictitious entities, corporate shells or offshore financial

22 accounts.  That's the guideline.  Those things exemplify

23 sophisticated means, and that's what was done in this case.

24 And Mr. Dowd was personally and actively involved in

25 sophisticated means because of his active involvement in the

1  setting up and maintaining of offshore accounts in Belize, and

2  he did that for years.

3         The important point here, your Honor, is that this

4  defendant did not act unwittingly.  He acted willfully and that

5  is the finding of the jury.

6         With regard to role in the offense, his role was

7  subordinate to Vallone and Bartoli.  But Vallone received a

8  four-level increase for organizer and leader.  We argue that

9  Bartoli should receive the same.  He has not yet been

10  sentenced.  We are not asking for that four-level enhancement

11  for this defendant.  So, yes, his role was subordinate to

12  Vallone.  But he was not a minor or a minimal participant.

13  When you look at participants, you have to look at all of the

14  participants, all the criminally responsible people, not just

15  the people that are convicted.  That's what the guidelines say.

16         In this matter, in this jointly undertaken criminal

17  activity, there were hundreds of participants.  There were

18  taxpayers who willfully were involved in the scheme, tax

19  preparers.  There were -- some of whom received direction from

20  Mr. Dowd.  There were managers throughout the country.  There

21  were a lot of people around the country.

22         Mr. Dowd was in the home office.  He was involved for

23  four years.  He helped manage accounts.  He briefly sold some

24  accounts.  He instructed taxpayers.  He was the principal

25  liaison to Belize.  And in 2000, he was promoted to operations

1 manager.

2        Now, I'm not saying operations managers like the CEO

3 of an organization.  That was Vallone.  But operations manager

4 was not a minor or a minimal participant.  His participation

5 was about average, which means the presentence report was

6 correct in neither adding nor subtracting offense levels

7 because of role in the offense.

8        The argument -- and because, as I have argued, he is

9 not a minimal participant, the loss was foreseeable to him, the

10 loss does not overstate the seriousness of the offense.  In

11 fact, it measures the seriousness of the offense pretty

12 precisely.

13        The argument based on parental influence, which has

14 somehow morphed into diminished capacity, should be rejected.

15 This is not a case of duress or coercion or imperfect duress or

16 imperfect coercion.  If you read the letter written by the

17 defendant's father, what he said was that he was familiar with

18 Heritage America and "I recommended that my son apply for a

19 staff job."  He recommended that he apply for a staff job.

20        The critical point is that neither in the defendant's

21 testimony on the witness stand nor in this letter from the

22 father, does it indicate that the father in any way forced the

23 defendant to commit a crime.  And there is nothing in the

24 letter that says he even suggested that the defendant commit a

25 crime.  All he did was recommend that the defendant work at

1    Heritage.  That's not coercion or anything like that.

2             And Mr. --

3             THE COURT:  Are you ready to pounce, Mr. Meczyk?

4             MR. ELDEN:  Mr. Meczyk is just fluttering his pages,

5    that's why I looked over there.

6             THE COURT:  On this issue of diminished mental

7    capacity, along the way the Court has considered United States

8    of America versus Luis Miranda decided by the Seventh Circuit

9    October 26, 2007, in an opinion by Judge Rovner.  There is a

10   footnote, 5K2.13:  "A downward departure may be warranted if

11   the defendant committed the offense while suffering from a

12   significant reduced mental capacity."

13            There is nothing in the evidence here to indicate

14   that the defendant was doing what he did while under some

15   reduced mental capacity.  Also, that "The significantly reduced

16   mental capacity contributed substantially to the commission of

17   the offense.  Similarly, if a departure is warranted under the

18   policy statement, the extent of the departure should reflect

19   the extent to which the reduced mental capacity contributed to

20   the commission of the offense."

21            There is nothing in the evidence to support a mental

22   deficiency or some reduced mental capacity on the part of the

23   defendant while employed for five years along with the

24   co-defendants.

25            But the footnote goes on to say, "However, the Court

1  may not depart below the applicable guideline range if the

2  significantly reduced mental capacity was caused by the

3  voluntary use of drugs or other intoxicants."

4          None of that is present in this case, of course.

5          "The facts and circumstances of the defendant's

6  offense indicate a need to protect the public because the

7  offense involved actual violence or a serious threat of

8  violence."

9          That too is not present.

10         And further, "The defendant's criminal history

11 indicates a need to incarcerate the defendant to protect the

12 public."

13         There is no criminal history involved in this case.

14         And further, "The defendant has been convicted of an

15 offense under Chapter 71."

16         But there is not evidence established by the

17 defendant, nothing within the context of the trial to suggest

18 in any way the relationship between Mr. Dowd and his father

19 would somehow reach the level of having the defendant suffer

20 from a significantly reduced mental capacity.

21         And that "If it did exist, the significantly reduced

22 mental capacity contributed substantially to the commission of

23 the offense."

24         Here, the Court should say "offenses."

25         Furthermore, the Court can, of course, take into

1    account this relationship between the father and the son, as

2    Mr. Meczyk has argued, but it does not reach the level

3    suggested by the guidelines or its comments that somehow there

4    was diminished mental capacity on the part of the defendant as

5    he did the things the jury found him guilty beyond a reasonable

6    doubt of doing.

7            But go on with your argument.

8            MR. ELDEN:  Yes.

9            Your Honor, we ask the Court to impose a sentence

10   within the guideline range as indicated in the presentence

11   report.

12           And we ask -- and because -- based on the factors in

13   Section 3553, the seriousness of the offense is indicated by

14   the amount of money involved, $50 million.  The defense counsel

15   says that the Court should impose a sentence of probation.

16   That is really a ridiculous recommendation because under

17   Section 3553, the Court also has to -- is told to avoid

18   unwarranted sentence disparities.  And there are persons

19   convicted throughout the country for evading, let's say,

20   $50,000 in taxes, and they are serving jail time.  There are

21   those who are involved in schemes involving hundreds of

22   thousands of dollars in lost taxes.  They are serving jail

23   time.  This involved 50 million.  And it would be so out of

24   line with all of the other defendants who are sentenced for tax

25   fraud that we would suggest that the -- that it would be an

1  unwarranted sentence disparity.

2          And in this case, you have not only the loss of money

3  to the United States Treasury, but we ask the Court to consider

4  all of the people who purchased these Aegis systems.  All of

5  these people who themselves are collateral victims of this

6  scheme.  Because they eventually wound up having to pay their

7  taxes, but with interest and penalties.  And all -- and

8  Mr. Dowd was very much involved in dealing with clients.  All

9  of those clients are collateral, indirect victims of this

10 scheme.

11         THE COURT:  Did any of the clients go to jail to your

12 knowledge?

13         MR. ELDEN:  Yes, Judge.  Several clients went to

14 jail.

15         And certainly, certainly it would be an unwarranted

16 disparity if Mr. Dowd did not go to jail.  And we would suggest

17 that the way to have -- to avoid an unwarranted sentence

18 disparity and to deter others from committing this kind of a

19 crime and to show the respect for the seriousness of the

20 offense would be to sentence the defendant within the guideline

21 range, and we so request that your Honor sentence the

22 defendant.

23         THE COURT:  The co-defendant Vallone has been

24 sentenced and he was sentenced to 223 months in the Bureau of

25 Prisons.  Co-defendant --

```
 1              MR. ELDEN:  I think that was Vallone, Mr. Vallone.
 2              THE COURT:  Excuse me.  Vallone, yes.  Michael A.
 3    Vallone, 04 CR 372-1, was sentenced to 223 months.
 4              William Cover, 04 CR 372-5, was sentenced to 160
 5    months.
 6              Bartoli, Hopper, Dunn, Parker and Stambulis yet have
 7    to be sentenced.
 8              MR. ELDEN:  That is correct.
 9              THE COURT:  All right.  Mr. Meczyk, do you wish to
10    reply?
11              MR. MECZYK:  Your Honor, may it please the Court.
12              Your Honor, it is a specious, it is a false argument
13    that the United States attorney makes to you.  I can't say, in
14    no uncertain terms, how livid it makes me because he paints
15    with too broad a brush as far as disparity is concerned.
16              He is not telling you what the history and
17    characteristics are of other people who were sentenced for tax
18    fraud cases were.  But this case is truly singular, it's sue
19    generis, it's different.  I can bet anything on it, it's
20    different than all the others.  Because in all the other cases
21    I can pretty much assure the Court they did not have a
22    22-year-old man who went to work for this company.
23              In all the other cases, your Honor, they did not
24    have, I think a 22-year-old man with his family history and his
25    characteristics living in that type of a household.  Your
```

1  Honor, I know that you just told Mr. Elden, you told him that

2  you didn't think that there was an imperfect coercion.  I'm not

3  quarreling with the Court that there was not a diminished

4  capacity.  Your Honor, I never asserted that defense to the

5  Court.

6          It would have -- I think it's the height of hypocrisy

7  for Mr. Elden to tell you, you never heard him say anything

8  from the witness stand when Michael testified about his family

9  background.  Because if he got into that type of testimony, I

10  can assure the Court that Mr. Elden would have leapt to his

11  feet and objected and his objection should have been sustained

12  or would be sustained because it is irrelevant.  It had nothing

13  to do with the defense that he asserted in this case.  For him

14  to say, well, look at his father, his father.  His father is

15  not the one on trial.  Do you expect that anyone in this

16  courthouse or this courtroom expect that Mr. Dowd would give a

17  mea culpa to the Court?  Maybe Mr. Dowd is a proud man.  I'm

18  sure he is.  I'm sure he's remorseful for what happened.  Maybe

19  he couldn't express himself in a missive, maybe his pain is too

20  deep to express himself in a missive.  But Mr. Elden seizes on

21  that to show that there was no diminished capacity.

22          Your Honor, you know from the letters here that

23  Michael was an obedient son, a dutiful son and a good son.  He

24  just did not have the capacity, he did not have the maturity,

25  he did not have the will to say no.

```
1              How can the government compare Mr. Vallone or
2   Mr. Bartoli or any other defendant sentenced in this case to
3   what Mike Dowd did?  He talks about the foreseeability.  What
4   did he do?  He had an XL spreadsheet plugging in numbers.  What
5   was his correspondence with the lawyer in Belize, that British
6   gentleman who testified in court?  What was his correspondence?
7              He was saying, I'm sending you this check to keep
8   current this trust.  That was his correspondence with the Aegis
9   customers who he claims -- Mr. Elden has the nerve, the
10  audacity to claim that they are victims?  Your Honor, those
11  people were far more sophisticated, far more -- had far greater
12  business acumen that Mike Dowd in his wildest dreams didn't
13  have.  They were people with net worths of $5 million and up.
14  Most of them had net worths of over $1 million.  They knew full
15  well, eyes wide open what they were getting into.
16             How did Mike encourage them?  What did he say to
17  encourage them?  He was parroting what Cover told him to do.
18  His correspondence with the man in Belize was just sending him
19  checks to keep these trusts current.  His communications with
20  the customers of Aegis was to say, you got to send the check to
21  keep current with this trust fund.
22             It is the height of hypocrisy for the U.S. Attorney
23  to come into your court and say those people were victims.
24  Those people were made deals.  Those people were audited.  And
25  they paid, and they were glad they paid because their fat was
```

1   in the frying pan too.  To say they are victims is a specious

2   and false argument.  I take umbrage with that argument.

3           Again, the issue of disparity.  I don't have the

4   statistics, Mr. Elden doesn't have the statistics of the

5   individuals that were sentenced to prison for tax offenses.

6   But as I said to this Court, to your Honor, this case is

7   singular.  It is unique.  One of the criterion for 3553,

8   Section 3553, that says that the District Court should take

9   into account is the history and the characteristics of the

10  person to be sentenced before you.  If ever there were

11  characteristics of selflessness, of kindness, of innocence, of

12  virtue, it's this case.  I'm willing to bet anything that

13  Mr. Elden, if he were to provide the Court with empirical

14  facts, with statistics as to the background of the people

15  sentenced, he could never even come close to the type of person

16  that Mike Dowd is.

17          Your Honor, I respectfully urge the Court -- and

18  please don't misinterpret my tone.  As I told you when I made

19  my opening remarks this morning to you, I stand humbled before

20  you and I am humbled before you.  But I have to tell --

21          THE COURT:  Not me.  The Court.

22          MR. MECZYK:  The Court, of course.  The Article III

23  Judge I stand before.

24          My remarks are -- I hope you interpret them as just

25  trying to be an advocate for my client, but I fervently

1  believe --

2           THE COURT:  You are zealous.

3           MR. MECZYK:  Yes, yes, your Honor.

4           I did not write the Court a missive.  I have been a

5  practicing attorney for 32 years as a criminal defense lawyer.

6  I just want to add my voice to the other people that wrote the

7  Court, and I want to say this.  That I personally am honored

8  and privileged to represent Mike Dowed.

9           Your Honor, I respectfully urge you, if ever there

10 was a case for probation, straight probation, this is the case.

11          Thank you, your Honor.

12          THE COURT:  Mr. Dowd, you have the right to make a

13 statement to the Court before the sentence is imposed.  You

14 also have the right to remain silent, which means to say

15 nothing.  If do you want to speak, get close to the microphone

16 and say whatever you want to say.

17          THE DEFENDANT:  I'd like to say I'm sorry for what I

18 did and --

19          THE COURT:  Well, what is it you did?

20          THE DEFENDANT:  Working and staying at the Aegis

21 company and defrauding the government.  And I should have been

22 more independent.  And looking back, I should have taken a hard

23 skeptical look at what Aegis was doing.  I'm sorry.

24          THE COURT:  Does that complete your statement?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  I don't think that you have come to grips

2   with the fact that you have been found guilty by a jury beyond

3   a reasonable doubt of conspiracy to defraud the United States,

4   to commit mail fraud and also to file false tax returns over a

5   period of years.  From what you have just said, you're not

6   accepting responsibility for criminality.  It's some kind of

7   rationalization, which is more or less consistent with what you

8   said on the witness stand.

9          Since I have transitioned into that point, let me say

10  that the government's argument that you committed perjury on

11  the witness stand is a sound argument.  However, I am going to

12  give you the benefit of the doubt and find that you did not

13  perjure yourself on the witness stand; that your testimony did

14  not materially affect the outcome of the case.  But it is a

15  very strong argument to be made that what you said on the

16  witness stand to a certain extent was not truthful.  But I will

17  accept the point made by your attorney that I should not say

18  you obstructed justice by making a finding that you committed

19  perjury.  But there is a very strong argument to be made on

20  that point.

21          Now, with respect to filing false income tax returns

22  for which you were found guilty, in filing those tax returns

23  you acknowledge that you have an obligation to tell the truth

24  and the jury found that you did not tell the truth in the sense

25  that you have been found guilty of filing false income tax

1   returns.

2           You have also been found guilty of mail fraud beyond

3   a reasonable doubt.  There is no doubt whatsoever, and the jury

4   found beyond a reasonable doubt, that you were one of the

5   conspirators involved in this case.  And yet your reaction to

6   it is a few brief sentences which does not acknowledge to any

7   significant extent your criminality.  And the remorse that you

8   seem to show is more for yourself, a self-directed remorse

9   without a recognition somehow that all of this was wrong and

10  was a violation of the law.

11          In terms of the argument of excessive obedience, the

12  one thing you failed to acknowledge along the way, and the jury

13  so found, was the obligation to follow the law.  There is no

14  obedience to the law.  There is no recognition of an obligation

15  to follow the law.

16          To the extent somehow that you have said that you

17  were an obedient son, the evidence essentially before the Court

18  is that your father recommended that you apply for a job with

19  Aegis, which you did.  You remained there for five years.  When

20  you started in 1997, you were just out of college and 22.

21  Nothing your father did was wrong in making a recommendation

22  that you go there, give it a try and see how it works out.  You

23  stayed there for five years.  Your father didn't make you do

24  that.

25          You were, of course, a loving son and your father

1   loving as to you as well.  You had many friends and family who

2   loved you and supported you.  But nobody made you stay at Aegis

3   for five years.  Nobody made you file those false tax returns.

4   Nobody made you go to the seminars.  Nobody made you converse

5   with Mr. Jenkins or take all the steps that you took to make

6   this conspiracy succeed.  You were promoted.  You were an

7   administrative head.

8          Eventually when the IRS started to put more heat on

9   the operation, you were a member of the committee to try to

10  deal with this.  Your signature appears on numerous documents.

11  There were 1.6 million documents turned over by the prosecution

12  to the defense in this case, and hundreds of documents were

13  received in evidence.  Your name is everywhere.

14         You were not simply a young man passing through the

15  office or getting the coffee.  That might have been for the

16  first week or so.  But as time went on, you worked hard to make

17  this conspiracy succeed.

18         And the evidence is clear that you were aware of the

19  breadth of the conspiracy in terms of the number of people that

20  were participating.  You knew that each one of those so-called

21  clients was being billed by the operation.  There was a

22  substantial annual fee that these so-called victims were

23  paying.  You were well aware, as Mr. Elden argues, that the

24  reason that they sought the tax advice was that these were

25  extremely wealthy people who were trying to avoid or evade the

1  payment of taxes.  All of this is clear in the evidence.

2          And so the idea that somehow blind obedience or just

3  following orders or parental direction is mitigating, just

4  rings hollow.  It may well be that you felt a strong obligation

5  to your parents to keep on working, but there is nothing to

6  suggest that your father, for example, would say, keep on

7  working in an environment that you believe to be unlawful.

8  There is absolutely no evidence whatsoever to draw that

9  inference or to even speculate on the point.

10          What your father has somehow indicated is a sense of

11  guilt or a disappointment with himself for in the first

12  instance suggesting that you take the job.  But after some

13  point in time what you did, you did yourself as an educated

14  adult.

15          On some other points that I should bring up.  I am

16  concerned, however, about the $50 million tax loss.  The cutoff

17  figure argued by the government is $50,085,851.  The range to

18  support the imposition of a larger sentence is in excess of 50

19  million, 50 million to 100 million.

20          Is that correct, Mr. Meczyk?

21          MR. MECZYK:  It is, your Honor.

22          THE COURT:  So this is a close call in terms of

23  saying you just made it over the line by $85,000 where we're

24  talking about 50 million, 50 million to 100 million dollar

25  range.

1    So on that point, Mr. Elden, what is your argument to

2 reach that precise figure, 50,085,851?  Is there any room for

3 flexibility or tolerance or is that a figure that is so clear

4 that the Court should feel an obligation to make that

5 particular finding?

6    MR. ELDEN:  Your Honor, that figure -- and we

7 recognize it's close to the line -- that figure is conservative

8 in several different ways.

9    Number one, it doesn't include -- that's the 50

10 million for clients.  That doesn't include perhaps another

11 million for the defendants.

12    And then, of course, the fact that there are those

13 320 clients -- excuse me, 230 clients who were not a part of

14 that 50 million.

15    THE COURT:  Nor were they a part of the 60 million.

16    MR. ELDEN:  That's correct.

17    So we consider that a conservative figure.

18    THE COURT:  What is your response, Mr. Meczyk?

19    MR. MECZYK:  Your Honor, it's simply the word of the

20 government.  We don't -- I can't challenge that figure right

21 now.  They say it's conservative.  It may be --

22    THE COURT:  Well, you challenged it at trial.  You

23 and other defense counsel cross examined --

24    MR. MECZYK:  I did not on the figure, your Honor.

25    THE COURT:  I don't know if you personally did --

1          MR. MECZYK:  Yes.

2          THE COURT:  -- but it was a figure challenged by

3   co-defendants and in effective cross-examination of the

4   witnesses.

5          MR. MECZYK:  Yes, it was.  It was.  Not the effective

6   cross-examination by me, your Honor, by other attorneys who

7   challenged it.

8          THE COURT:  And you obviously would have taken a

9   similar position?

10          MR. MECZYK:  That is correct, your Honor.

11          THE COURT:  All right.

12          Let us move on to other issues, and I will return to

13   that one in particular.

14          On the role that Mr. Dowd played, he did not play a

15   minor role.  It is hard to find anybody amongst the indicted

16   co-conspirators who played a minor role.  Even Parker and

17   Stambulis, who have entered pleas of guilty, did not play a

18   minor role in the sense that they were attorneys and advising

19   and aiding and abetting and participating in the activities of

20   the conspiracy to accomplish its objectives.  Mr. Dowd's role

21   here was not a minor role.

22          In terms of culpability or a hierarchy, he certainly

23   did not play a role equal to that of Mr. Vallone, or yet to be

24   sentenced Mr. Dunn, or yet to be sentenced Mr. Bartoli.

25          But he was very actively engaged in doing what he

1    could to accomplish the conspiratorial objectives and on a

2    day-to-day basis, so he did not play a minor role.  As the

3    government has said that Mr. Vallone received a heavier

4    sentence because he was punished for being one of the

5    organizers and substantial decisionmakers and supervisors of

6    the conspiracy itself.

7            Dowd was well aware for a period of five years that

8    he was participating in a jointly undertaken criminal activity

9    that was depriving the treasury of millions of dollars.

10           On an additional point, the issue of sophisticated

11   means, the entire operation of the Aegis system and its

12   counterparts was one of sophisticated means.  That was what it

13   was all about.  Each one of the co-defendants worked zealously

14   to try to make it succeed by setting up or hiding transactions,

15   such as the purchase or sale of assets using fictitious

16   entities, corporate shells, or offshore financial accounts on a

17   routine basis.  And the objective of the conspirators was to

18   confuse the IRS and by using these sophisticated means, conceal

19   their true objectives.

20           I have rejected the concept of diminished mental

21   capacity.  It doesn't exist here.

22           As far as parental influence, yes, it is correct to a

23   limited extent that Mr. Dowd was influenced by his parents.

24   But that influence did not reach any level that would suggest

25   that they were saying stick with it, notwithstanding what you

1    know to be unlawful conduct.  There is nothing here to support

2    that inference.  Do a good job, do the best you can, work hard,

3    yes, that's part of legitimate parental influence that I think

4    was asserted in this case.  But to take it to some higher level

5    is clearly not warranted here.  It may in the mind of Mr. Dowd

6    have influenced to a certain extent what he was doing, but not

7    that in any way reached some higher level so as to justify

8    imposing a lesser sentence on that point.

9         The Court does have an obligation to look at the 3553

10   factors as the presentence investigation report has included,

11   and as Mr. Meczyk has argued and also contained within his

12   submissions.  These factors are also well discussed within all

13   of the communications the Court has received from these various

14   persons who are interested in the welfare of Mr. Dowd.  They

15   have written to tell the Court of the Dowd that they have

16   known, that they have seen, that they have heard.  The good

17   things he has done in his life and how he has helped them and

18   how they perceive him as a good person.  I certainly will not

19   ignore that, but the Court cannot lose sight of the fact of

20   conviction by the jury in this case.

21        The 3553 factors and the Rita decision and the Dean

22   decision require the Court to look at the nature and

23   circumstances of the offense.  In this case I have indeed done

24   so.  And given the amount of money at issue, the loss, whether

25   its 50 million or 60 million or a hundred million, it is

1   clearly a substantial amount of money.  The nature and the

2   circumstances of the offense here are a critical aspect of the

3   sentencing decision.  Furthermore, there are multiple crimes of

4   conviction.

5           So when imposing a sentence, the Court must -- the

6   sentence must reflect the seriousness of the offense, it must

7   promote a respect for the law.  That is indeed important in

8   this case when the co-conspirators themselves failed to do

9   anything that indicates a respect for the law.  The objective

10  of this conspiracy was to avoid the law using unlawful means or

11  some misinterpretation, some willful misinterpretation of the

12  tax laws and to make money along the way.

13          The sentence must also serve as a deterrent to others

14  and must protect the public from further crimes of the

15  defendant.  That last point is not of major concern here.  I

16  don't think there is anything in the record to suggest future

17  criminality on the part of Mr. Dowd.  I expect that when he is

18  ultimately released, that he will go on to lead a very

19  productive and lawful life.

20          There is no need in terms of the sentencing to

21  consider additional educational or vocational training.  He

22  certainly doesn't need that.  Anything that he would do beyond

23  this point would be for self-improvement and that would be fine

24  on his part.

25          There is no indication of a need for medical care or

1 other correctional treatment.

2        The Court must, of course, consider the kinds of

3 sentences that are available.

4        The sentencing guidelines are no longer mandatory,

5 they are advisory to the Court.  And I have not lost sight of

6 that, of course.

7        The sentence must be just enough; not too much and

8 not too little.  That sometimes is difficult to determine.

9        So having made these findings, I think I have covered

10 all the points, except this amount of loss.  From the Probation

11 Department's standpoint, have I missed anything of which you

12 are aware?

13        THE PROBATION OFFICER:  No, your Honor.

14        THE COURT:  All right.

15        So we return then to the amount of loss.  The

16 government's position is that is a conservative figure based

17 upon the evidence which does not include the other persons who

18 were not part of the chart, the 1006 Chart, which was

19 ultimately received in evidence in the case and challenged by

20 defense counsel.

21        I have determined in other matters that the

22 government has established a loss of in excess of 50 million,

23 up to 100 million, with a more precise determination at $60

24 million.  However, as Mr. Meczyk has argued, there was some

25 period of time when although Mr. Dowd was employed at Aegis,

1  that he was not aware of the extent, depth or breadth of the

2  activities of the conspiracy and that it took some period of

3  time before he did become aware and did become a willing

4  participant in the activities.

5          So I am going to give him the benefit of the doubt in

6  light of the closeness of this issue and make a finding that

7  the reasonably foreseeable amount in his case is at some point

8  less than, less than $50 million.

9          There is a sound argument to be made by the

10 government on this point.  I have also not rejected

11 Mr. Meczyk's significant argument of this unawareness in the

12 early days of the conspiracy.  When he became fully accountable

13 for the knowledge of the foreseeability of loss is difficult to

14 determine, but it could not have been in the first few weeks,

15 it could not certainly have been in the first few months.  At

16 some point in time difficult to determine, he became fully

17 knowledgeable and accountable and there was a time when the

18 full loss was foreseeable to him.  But there must be some

19 subtraction from the 50,085,000 to account for that

20 difficult-to-determine period of time and the benefit in that

21 regard should be given, I believe, to the defendant in this

22 case.

23          So the offense level ultimately suggested by the

24 government would have been an offense level of 36, which would

25 have taken into account a finding by the Court of perjury.  As

1   I have said, I am not going to find perjurious testimony in

2   this case.

3           So the offense level then would have been, as

4   determined by the Probation Department, a 34, but that is

5   calculated based upon a loss of more than $50 million.

6           Is that correct, Miss Provada?

7           THE PROBATION OFFICER:  Yes, your Honor.

8           THE COURT:  All right.

9           Now, if the Court makes a finding of less than $50

10  million, where then would that take the total offense level and

11  what would be the resulting guideline range?

12          THE PROBATION OFFICER:  Your Honor, I believe the

13  offense level for that count is Count 1 would be reduced to 32,

14  but with the multiple count adjustment interest, I believe --

15          MR. HEINZE:  Judge, I don't believe there is a

16  multiple-count adjustment.  They are all grouped.

17          MR. MECZYK:  That's true, they're grouped.

18          THE PROBATION OFFICER:  I'm sorry.  I misread.  It

19  would be the 32.

20          THE COURT:  And that would result in a guideline

21  range of what?

22          THE PROBATION OFFICER:  121 to 151 months.

23          THE COURT:  Now, looking at a range of 34, the

24  advisory guideline range would be 151 to 188.  If the Court had

25  accepted the government's argument in terms of perjury, it

1  would have taken the offense level to 36, which would have been

2  a guideline range of 188 to 235 months.  Now, having determined

3  that the total offense level here is a 32, the guideline range

4  is 121 to 151 months.

5          Is there anything finally that you want to say,

6  Mr. Meczyk?

7          MR. MECZYK:  Your Honor, I ask you respectfully to

8  under 3553 to depart from the guidelines.  They are advisory.

9  You have unfettered discretion to sentence Michael Dowd to

10  whatever you wish.  And it would all be justified based on his

11  history and his characteristics.

12          Respectfully, your Honor, I ask you to depart from

13  that Draconian number.

14          THE COURT:  Mr. Elden, your final comments, if any.

15          MR. ELDEN:  Your Honor, we have nothing further to

16  add.  We think that the Court should sentence within the

17  guideline range that the Court has determined.

18          THE COURT:  Mr. Dowd, is there any final statement

19  you want to make?

20          MR. MECZYK:  You're truly contrite?

21          THE DEFENDANT:  I'm contrite and I'm sorry for taking

22  up your time.

23          MR. MECZYK:  Do you mean what you say?  Do you mean

24  what you say?

25          THE COURT:  I think you're speaking maybe because

1  you're nervous.

2          MR. MECZYK:  He is, your Honor.  He's --

3          THE COURT:  But the point of apologizing for taking

4  up the Court's time really misses the mark.  I'm sure you

5  understand that, or on reflection you will.  I think it's an

6  inability on your part to articulate your true feelings.  It is

7  not certainly easy for one to do so under these circumstances.

8  But I think that you have much more to say, but you have been

9  unable to articulate it.  I'm not going to say that I'm taking

10  into account things you haven't said, but deep down I think

11  there is some sense of recognition on your part that what you

12  did was wrong and that you do ultimately regret it and that you

13  do ultimately say you did it yourself.  That you did it.

14          THE DEFENDANT:  Yes.

15          THE COURT:  So I am going to impose a sentence at the

16  low end of the advisory guideline range of 121 months.  So this

17  is as to all of the counts you that you were found guilty of.

18          So as to Count 1, it would be 60 months, and as to

19  Counts -- excuse me -- and 36 months on Counts 52 through 55,

20  and with respect to Count 3, 121 months.  And my objective is

21  that all of this would be served concurrently.  The

22  recommendation originally was 188 months on Count 3.

23          Is there any issue from a Probation Department

24  standpoint with imposing a sentence of 121 months as to Count

25  3?

1              THE PROBATION OFFICER:  No, your Honor.

2              THE COURT:  So the ultimate final total sentence on

3   all counts is 121 months in the Bureau of Prisons.

4              Additionally, the Court finds that the defendant does

5   not have the financial ability to pay a fine.

6              The defendant is not ordered to pay the costs of

7   incarceration, is not obligated to pay the costs of

8   supervision.  Supervised release, that is.

9              He must, however, pay the special assessment of $100

10  with respect to each of the six counts for which he has been

11  found guilty.

12             The term of supervised release will be for two years.

13  And this term consists of terms of two years on each of Counts

14  1 and 3 and terms of one year on each of Counts 52, 53, 54 and

15  55.  All supervised released shall be served concurrently.

16             Within 72 hours of release from custody of the Bureau

17  of Prisons, the defendant shall report in person to the

18  probation office in the district to which he is released.

19             There is no issue in this case with respect to

20  controlled substance or violence.

21             The defendant, however, shall routinely submit to the

22  collection of a DNA sample.

23             Is restitution in any way an issue in this case,

24  Mr. Elden?

25             MR. ELDEN:  No, your Honor, but there is costs of

1    prosecution.

2              THE COURT:  The costs of prosecution you will be

3    submitting somewhere along the way, or do you have a proposed

4    order now?

5              MR. ELDEN:  We already have, Judge.  It's the same

6    for every defendant.  Our position would be that they are

7    jointly liable for it.

8              THE COURT:  All right.  I will review that order and

9    then enter an appropriate order during the course of the day,

10   or if there is an issue with that issue of costs of

11   prosecution, counsel will be advised and I will permit argument

12   on the point.

13             So, Mr. Dowd, you have the right to appeal the

14   decision of the Court.  Any notice of appeal must be filed in

15   the Clerk's Office within ten days.

16             If you cannot afford an attorney for purposes of the

17   appeal, the Court will appoint an attorney to represent you

18   without any cost on your part.

19             You can direct Mr. Meczyk or any attorney to file the

20   notice of appeal.  You can also file the notice of appeal

21   yourself in the Clerk's Office.

22             What is your position, Mr. Meczyk, as to a surrender

23   date?

24             MR. MECZYK:  Your Honor, respectfully, may we have 90

25   days to surrender?

1          THE COURT:  Mr. Elden, what is your response?

2          MR. ELDEN:  Judge, if I could just confer.

3      (Pause.)

4          MR. ELDEN:  We have no objection to that, Judge.

5          However, there is one thing that we are looking up

6  right now, that is the maximum sentence on Count 3.  That's the

7  mail and wire fraud.

8          THE COURT:  Count 3 is the mail fraud.

9          MR. ELDEN:  Is the mail fraud.

10          And the presentence report does say that it's 20

11  years.  I do know that there was an amendment -- it used to be

12  five years for mail fraud, as your Honor recalls, and then was

13  an amendment.  And Count 3, I can't remember --

14          THE COURT:  Well, there is no point in wondering.

15  We'll take it up after lunch.  This certainly is a critical

16  issue.

17          MR. ELDEN:  Yes, because otherwise --

18          THE COURT:  And if there has been a change in the

19  law, then counsel and the Court should be aware of it.

20          MR. ELDEN:  Right.  In that if it is only five years,

21  then in order to implement the 121-month sentence, your Honor

22  would have to impose consecutive sentences on some of the

23  counts.

24          THE COURT:  All right.  We will take it up after an

25  hour lunch.

1          Mr. Meczyk, you can look into that as well.

2          MR. MECZYK:  Certainly, your Honor.

3          THE COURT:  We will deal with it.

4          So the final judgment has yet to be entered.  So if

5   you will come back in an hour, we will deal with it.

6          MR. MECZYK:  Thank you, your Honor.

7          THE COURT:  And then return to the issue of a

8   surrender date.

9          But since there is no objection, we could say the

10  surrender would be on February 27th to the designated

11  institution.  And if none is designated at that time, here to

12  the Marshal Service.  That's the surrender date.  The defendant

13  would remain free on bond during this time period.

14         But the final judgment has yet to be entered and

15  please come back in an hour.

16         MR. ELDEN:  Yes, Judge.

17         MR. MECZYK:  Your Honor, one further matter, and

18  maybe you want to take it up after lunch.  As far as the

19  designated facility, may we respectfully suggest to you the

20  Oxford facility in Wisconsin?

21         THE COURT:  I think that would be an appropriate

22  recommendation.  It would permit an opportunity for family and

23  friends to visit with Mr. Dowd.

24         But, Mr. Dowd, as Mr. Meczyk has no doubt told you,

25  the recommendation of the Court is not binding on the Bureau of

1    Prisons, they alone make that decision.  So don't be surprised

2    if you end up in Connecticut or Texas.  But it is the

3    recommendation of the Court that you would be committed to the

4    Bureau of Prisons in Oxford.

5              We'll take a break for about an hour.

6              I have another civil matter that Mr. Fulbright will

7    recall.

8              You're free to go.  Come back in an hour.  I want to

9    deal with this civil case.

10       (Proceedings recessed for one hour.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    IN THE UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF ILLINOIS
                             EASTERN DIVISION
3
   UNITED STATES OF AMERICA,       )
4                                  )
               Plaintiff,          )     04 CR 372
5                                  )
        vs.                        )     Chicago, Illinois
6                                  )     November 19, 2008
   MICHAEL T. DOWD,                )     12:00 o'clock p.m.
7                                  )
               Defendant.          )
8
                      TRANSCRIPT OF PROCEEDINGS
9           BEFORE THE HONORABLE CHARLES R. NORGLE, SR.

10
   APPEARANCES:
11
   For the Plaintiff:              OFFICE OF THE U.S. ATTORNEY
12                                 219 South Dearborn Street
                                   5th Floor
13                                 Chicago, Illinois  60604
                                   BY:  MR. BARRY R. ELDEN
14                                      MR. STEPHEN L. HEINZE

15 For Defendant Dowd:            MR. RALPH E. MECZYK
                                   111 West Washington Street
16                                 Suite 1625
                                   Chicago, Illinois  60602
17
   Probation Officer:             MS. JENNIFER PROVADA,
18                                 United States Probation Officer

19
                    MAELLEN E. PITTMAN, RDR, FCRR
20                   219 South Dearborn Street
                            Room 2342
21                   Chicago, Illinois  60604
                          (312) 435-5576
22                   mae.pittman@yahoo.com

23

24

25
```

1          (Proceedings in open court:)

2               THE CLERK:  04 CR 372, United States versus Michael

3     Dowd.

4               MR. ELDEN:  Good afternoon, your Honor.

5               Barry Elden on behalf of the United States.

6               MR. MECZYK:  May it please the Court, good afternoon,

7     your Honor.

8               Ralph Meczyk on behalf of Michael Dowd.

9               THE COURT:  Good afternoon.

10              THE PROBATION OFFICER:  Good afternoon, your Honor.

11              Jennifer Provada on behalf of the Probation

12    Department.

13              THE COURT:  I have discussed this issue with the

14    probation officer who has advised the Court that as to Count 1,

15    the maximum sentence is 60 months; as to Count 3, the maximum

16    sentence is 60 months; and as to the remaining counts, the

17    maximum sentence would be 36 months.

18              The Court earlier had indicated a sentence of -- a

19    total sentence of 121 months.  One way to correct the issue or

20    modify the issue would be to impose a sentence of 60 months on

21    Count 1, 60 months on Count 3 to run consecutively, and 36

22    months on each of the Counts 52, 53, 54 and 55, to run

23    concurrently with each other and concurrently with Counts 1 and

24    3, for a total of 120 months rather than 121 months.

25              What is the government's position?

1          MR. ELDEN:  Judge, that -- whether it's 120 or 121, I

2  leave to your Honor's discretion.  But if you wanted to do 121,

3  then what you would do would be 60 months on Count 1, 60 months

4  on Count 3, and then one month on Count 52, all consecutive.

5  Then you would do 53, 54 and 55 concurrently.

6          MR. MECZYK:  I suppose one month will make a

7  difference to Mr. Elden.  I'm more than satisfied with --

8          MR. ELDEN:  I didn't say it would make a difference,

9  Judge.

10          MR. MECZYK:  I'm addressing the Court.

11          MR. ELDEN:  I feel strongly --

12          MR. MECZYK:  I'm addressing the Court, not you,

13  Mr. Elden.

14          MR. ELDEN:  Objection.

15          THE COURT:  All right.  Just a moment, please.

16          Mr. Elden, have you completed your statement?

17          MR. ELDEN:  Yes.

18          THE COURT:  All right.

19          Mr. Meczyk, have you --

20          MR. MECZYK:  Your Honor, I'm more than satisfied with

21  your calculation.

22          THE COURT:  It therefore is the judgment of the Court

23  that the defendant is sentenced to 60 months on Count 1, 60

24  months on Count 3 to run consecutively for a total of 120

25  months, and that the sentence imposed on Count 52 is 36 months,

 1    Count -- excuse me -- Count 52 is 36 months, Count 53 is 36

 2    months, Count 54 is 36 months, Count 55 is 36 months, all to

 3    run concurrently with each other and concurrent to the total of

 4    120 months imposed on Counts 1 and 3.  So that in the final

 5    analysis the judgment of the Court is a total sentence of 120

 6    months.

 7             From this judgment then Mr. Dowd has the right to

 8    appeal.

 9             Mr. Dowd, if it is your intention to appeal, you must

10    file a notice of appeal in the Clerk's Office within ten days,

11    or you can direct your attorney to file that notice of appeal

12    within ten days.

13             You have the right to be represented by an attorney

14    on the appeal.  If you cannot afford one, one will be appointed

15    to represent you.

16             So discuss this issue with Mr. Meczyk or any attorney

17    and decide what it is that you want to do.  But any notice of

18    appeal must be filed in the Clerk's Office within ten days.

19             Now, as to the surrender date, I think I said

20    February 27th and that date will stand, and the recommendation

21    is for Oxford.

22             Is there any other issue the Court should deal with,

23    Mr. Elden?

24             MR. ELDEN:  No, your Honor.

25             THE COURT:  From the Probation Department's

```
1   standpoint, should I deal with anything else?

2           THE PROBATION OFFICER:  No, your Honor.

3           THE COURT:  Mr. Meczyk?

4           MR. MECZYK:  No, thank you, your Honor.

5           THE COURT:  That is the judgment of the Court.

6           Thank you.

7           MR. MECZYK:  Thank you, your Honor.

8           MR. ELDEN:  Thank you, your Honor.

9       (Proceedings concluded.)

10                      CERTIFICATE

11          I hereby certify that the foregoing is a true and

12  correct transcript of the proceedings in the above-entitled

13  case.

14

15  S/Maellen E. Pittman              September 14, 2009
    Official Court Reporter           Date
16

17

18

19

20

21

22

23

24

25
```